CITY OF NEWBURYPORT *vs.* ELEANOR J. WOODMAN, trustee,[1]
& another.[2]

No. 08-P-104.

Suffolk. November 10, 2009. - March 17, 2011.

Present: McHUGH, TRAINOR, & HANLON, JJ.

*Real Property,* Agricultural or horticultural use, Purchase and sale agreement,
Bona fide purchaser, Right of first refusal, Option. *Agriculture. Bona Fide
Purchaser. Statute,* Retroactive application.

Discussion of the standard of review applicable to a grant of summary judgment.
[89]
This court concluded that the 2006 amendment to G. L. c. 61A, § 14, which
changed the definition of a bona fide offer to purchase agricultural land
that triggers a municipality's right of first refusal, did not apply retroactively,
where the amendment was part of a broad legislative reappraisal of the
way in which forest, agricultural, horticultural, and recreational land are to
be taxed, managed, and preserved, and where there was no indication, in
the text of the amendment or otherwise, that the Legislature intended the
changes to apply retroactively. [89-92]
In a civil action, a Land Court judge erred in granting summary judgment in
favor of a city on the ground that a developer's offer to purchase certain
agricultural land from a trustee did not constitute a bona fide offer to purchase
within the meaning of G. L. c. 61A, § 14, where there was a binding agree-
ment between the developer and the trustee as buyer and seller. [92-94]
TRAINOR, J., dissenting.
In a civil action arising from a developer's offer to purchase certain agricultural
land from a trustee, there was no merit to the argument of a city that it
should be permitted to exercise its option, pursuant to G. L. c. 61A, § 14,
to purchase at fair market value only one of the two parcels involved, where
a single owner of two contiguous parcels sought with a single agreement to
sell both parcels to one buyer for one project. [94-95] TRAINOR, J., dissenting.

CIVIL ACTION commenced in the Land Court Department on
May 24, 2005.

The case was heard by *Leon J. Lombardi,* J., on a motion for
summary judgment.

[1]Of the Eleanor J. Woodman Realty Trust.
[2]Seaport Village, LLC.

*Leonard M. Davidson* for Seaport Village, LLC.

*Jonathan M. Silverstein* for the plaintiff.

*Martin J. Arsenault,* for Eleanor J. Woodman, was present but did not argue.

HANLON, J. Seaport Village, LLC (Seaport), appeals a Land Court judge's decision granting summary judgment to the city of Newburyport (Newburyport) on the ground that Seaport's offer to purchase certain agricultural land from a trustee did not constitute a bona fide offer for the purposes of G. L. c. 61A, § 14, as in effect prior to March 22, 2007. We reverse.

*Background.*[3] Eleanor Woodman, as the trustee of the Eleanor J. Woodman Realty Trust (Woodman), owns two parcels of land in Newburyport that have been classified and assessed as agricultural or horticultural land pursuant to G. L. c. 61A.[4] The property is fifty-five to sixty percent wetlands, and under the current zoning ordinance and subdivision regulations of Newburyport, the property may be divided as a matter of right into a maximum of two lots for use as single-family residences.

In March, 2005, Newburyport received a notice from Woodman indicating her intent to sell the two parcels of land to Seaport; she included a purchase and sale agreement that specified the terms of the proposed sale and treated the two parcels as one property of 21.93 acres. The agreement was "contingent upon the BUYER obtaining[,] at [its] expense, all necessary local, state and federal approvals including, but not limited to, conservation approvals and approvals from the City of Newburyport to develop the PROPERTY as a Residential Development under a Comprehensive Permit under [G. L. c.] 40B[5] from the Zoning Board of Appeal of the City of Newburyport,

---

[3]The facts are not disputed.

[4]Both parcels are located on Low Street; one parcel is 4.519 acres and the second is 17.420 acres.

[5]General Laws c. 40B, §§ 20-23, were enacted "to provide relief from exclusionary zoning practices which prevented the construction of badly needed low and moderate income housing" in certain municipalities. *Board of Appeals of Hanover* v. *Housing Appeals Comm.,* 363 Mass. 339, 354 (1973). Under the comprehensive permitting process, a zoning board of appeals may waive any local by-law, ordinance, or regulation. See G. L. c. 40B, § 21. "The structure of the act 'reflects the Legislature's careful balance between leaving to local authorities their well-recognized autonomy generally to establish local zoning requirements . . . while foreclosing municipalities from obstructing the

City of Newburyport v. Woodman.

Housing Appeal Committee or court with competent jurisdiction
. . . ."[6] The purchase price was set at $1.8 million; however, if
Seaport obtained fewer than 150 residential units the price
would be reduced by $12,000 for each unit not approved, with a
minimum sale price of $1.5 million.

In May, 2005, after receiving the notice from Woodman,
Newburyport filed a verified complaint in the Land Court seek-
ing a judgment declaring its rights in connection with the notice
of intent to sell the agricultural land, and a determination that the
purchase and sale agreement was not a bona fide offer triggering
its right of first refusal under G. L. c. 61A, § 14. Specifically,
Newburyport argued that the "Purchase & Sale Agreement does
not constitute a bona fide offer because among other reasons, the
price is based on numerous contingencies . . . [and] unlike con-
ventional development schemes, it is impossible for [Newbury-
port] to assess the possible development yield on the site under
the unpredictable procedures for review of c. 40B proposals."

On June 22, 2005, a Land Court judge granted Newbury-
port's motion for a preliminary injunction, enjoining Woodman
from conveying any portion of the property, or rights therein,
and tolling the 120-day time period under § 14. In June, 2007,
Seaport filed a motion for summary judgment, and according to
Seaport, Woodman assented. Newburyport filed an opposition
and requested summary judgment in its favor.

While the case was pending, the Legislature amended § 14.
The version of G. L. c. 61A, § 14, that was in effect when Wood-
man sent her notice of intent to Newburyport stated that

building of a minimum level of housing affordable to persons of low income.' "
*Board of Appeals of Woburn* v. *Housing Appeals Comm.*, 451 Mass. 581, 584
(2008), quoting from *Zoning Bd. of Appeals of Wellesley* v. *Ardemore Apart-
ments Ltd. Partnership*, 436 Mass. 811, 822-823 (2002).

[6]In addition to the c. 40B approval that was required under the purchase
and sale agreement, Seaport did not contest Newburyport's contention below
that approval to build 150 units on the property, which was over fifty percent
wetlands, would likely necessitate an order of conditions from the conserva-
tion commission of Newburyport and a possible superseding order of condi-
tions from the Department of Environmental Protection. Newburyport also
argued that, due to the extent of the wetlands on the property, additional
regulatory approvals might be triggered such as "review by state agencies
under the Massachusetts Environmental Policy Act (G. L. c. 30, § 61 et seq.)
and the Massachusetts Endangered Species Act (G. L. c. 131A), as well as
approval of the Army Corps of Engineers."

"Land which is valued, assessed and taxed on the basis of its agricultural or horticultural use under an application filed and approved pursuant to this chapter shall not be sold for or converted to residential, industrial or commercial use while so valued, assessed and taxed unless the city or town in which such land is located has been notified of intent to sell for or convert to such other use . . . . For a period of one hundred twenty days subsequent to such notification, said city or town shall have, in the case of an intended sale, a first refusal option to meet a bona fide offer to purchase said land . . . ."

G. L. c. 61A, § 14, as amended through St. 1987, c. 95, § 3. Under that version of the statute, "a town's right of first refusal ripens into an option to purchase when the town receives notice of an intended sale of land under c. 61A for a nonagricultural use." *Sudbury* v. *Scott*, 439 Mass. 288, 297-298 (2003). "The right of first refusal created by § 14 manifests a legislative intent to do more than help to make farming economically feasible by providing a tax incentive. The right of first refusal was intended to help preserve and protect the agricultural use of land by requiring notice to a town before land under G. L. c. 61A is converted or sold for nonagricultural use." *Id.* at 301.

In *Franklin* v. *Wyllie*, 443 Mass. 187 (2005), the Supreme Judicial Court, interpreting that same provision of § 14, addressed the situation where the "purchaser's obligation under the agreement [was] conditioned on the receipt of municipal approvals of a proposed residential subdivision plan, as well as all necessary permits, and the purchase price . . . [was] not fixed but [was] dependent on the number of subdivision units approved." *Id.* at 188. The court concluded that "a fully executed and enforceable purchase and sale agreement" constituted a bona fide offer, despite the fact that the agreement contained contingencies. *Id.* at 196.

The town of Franklin had argued that the agreement was not a "bona fide offer to purchase" because "the purchase price of the trust's land [could] only be determined after completion of the entire approval process for the purchasers' planned subdivision, including obtaining approval from the town planning board under G. L. c. 41K, § 81, as well as approvals for individual

building lots from the town conservation commission under
G. L. c. 131, § 40, and local bylaws, and approvals for the on-
site septic disposal systems from the town board of health under
G. L. c. 111" (footnote omitted). *Id.* at 192.

The court rejected that argument, holding that the offer was a
"bona fide offer" and noted that the "existence of contingen-
cies concerning obtaining approvals are common in real estate
transactions and do not make the agreement any less than a
bona fide offer." *Id.* at 194, and cases cited. The court's holding
"obligate[d] the town, if it [was] to exercise its right of first
refusal, to 'meet a bona fide offer to purchase.' G. L. c. 61A,
§ 14. In [*Wyllie*, that] meant accepting, within 120 days, the
terms of the purchase and sale agreement, including the 'agreed
purchase price' of $2,275,000 . . . [which] would have neces-
sitated expense by the town in determining, through its own of-
ficials and experts, the ultimate number of permissible lots in
the proposed subdivision." *Id.* at 196-197. The court noted that
"this [was the] consequence stemming from the nature of the
obligation imposed by the statute, until such time as the Legis-
lature chooses to amend the statute to state differently." *Id.* at
197. In a final aside, the court observed, "In enacting [§ 14] in
1973, the Legislature may not have directly contemplated the
type of purchase and sale agreement executed here." *Id.* at 196.

The Legislature did amend G. L. c. 61A, § 14, very shortly
after the holding in *Wyllie* was announced.[7] The statute now
defines a bona fide offer to purchase as

> "a good faith offer, *not dependent upon potential changes
> to current zoning or conditions or contingencies relating
> to the potential for, or the potential extent of, subdivision
> of the property for residential use or the potential for, or
> the potential extent of development of the property for
> industrial or commercial use*, made by a party unaffiliated
> with the landowner for a fixed consideration payable upon
> delivery of the deed" (emphasis added).

G. L. c. 61A, § 14, as amended through St. 2006, c. 394, § 31.

_____

[7]*Franklin* v. *Wyllie*, 443 Mass. 187 (2005), was decided on January 4, 2005;
the amendments to § 14 were approved December 22, 2006, and became ef-
fective March 22, 2007, three months prior to Seaport filing its summary
judgment motion in this case.

Here, both parties agree that, had the amended version of the statute been in effect at the time of the notice of intent, Seaport's purchase and sale agreement would not have constituted a bona fide offer.

*Summary judgment motion.* After a hearing in the Land Court, in November, 2007, the judge granted summary judgment in favor of Newburyport. First, the judge ruled that the amendments to § 14, which had taken effect in March, 2007, did not apply retroactively. The judge then distinguished this case from *Wyllie*, finding that the contingencies in the purchase and sale agreement, including the requirement for c. 40B approval, would extend the holding in *Wyllie* too far. The judge concluded that, due to the "highly speculative" nature of Seaport's offer, it was not a bona fide offer that would trigger Newburyport's right of first refusal under § 14. Seaport appealed.[8]

*Discussion.* a. *Standard of review.* "[T]he standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Siebe, Inc.* v. *Louis M. Gerson Co.*, 74 Mass. App. Ct. 544, 548 (2009), quoting from *Nelson* v. *Salem State College*, 446 Mass. 525, 530 (2006). "Our review is de novo." *Id.* at 549. "Rule 56(c) [of the Massachusetts Rules of Civil Procedure, as amended, 436 Mass. 1404 (2002),] provides that summary judgment shall be granted if the 'pleadings, depositions, answers to interrogatories, and responses to requests for admission . . . , together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Bardige* v. *Performance Specialists, Inc.*, 74 Mass. App. Ct. 99, 102 (2009).

b. *Retroactivity of amendment to G. L. c. 61A, § 14.* Newburyport argues that the amendment to the statute, changing the definition of bona fide offer, should be applied retroactively because the new language, in the aftermath of a contrary statutory interpretation in *Wyllie*, represents the Legislature's original intent in G. L. c. 61A, § 14. See *Swift* v. *AutoZone, Inc.*, 441

---

[8]Woodman has not appealed from the denial of the defendants' summary judgment motion.

Mass. 443, 449-450 (2004). Seaport argued below, and the Land Court judge agreed, that "[a] statutory amendment that extinguishes a substantive right only operates prospectively, absent an explicit pronouncement from the Legislature to the contrary." *Fleet Natl. Bank* v. *Commissioner of Rev.*, 448 Mass. 441, 450 (2007).

"As a general matter [of statutory construction], 'all statutes are prospective in their operation, unless an intention that they shall be retrospective appears by necessary implication from their words, context or objects when considered in the light of the subject matter, the pre-existing state of the law and the effect upon existent rights, remedies and obligations. . . . It is only statutes regulating practice, procedure and evidence, in short, those relating to remedies and not affecting substantive rights, that commonly are treated as operating retroactively, and as applying to pending actions or causes of action.' " *Id.* at 448-449, quoting from *Hanscom* v. *Malden & Melrose Gas Light Co.*, 220 Mass. 1, 3 (1914).

In the instant case, we agree with the Land Court judge that the amendments to c. 61A were substantive changes intended to apply prospectively. See *DiMarzo* v. *American Mut. Ins. Co.*, 389 Mass. 85, 102 (1983) ("an amendment to a statute presumably intends a change in the law"); *Brooks* v. *School Comm. of Gloucester*, 5 Mass. App. Ct. 158, 161 (1977) (same). Although "the Legislature may amend a statute simply to clarify its meaning[,] . . . [t]he extent to which an amendment may properly be used to aid in the interpretation of the original statute turns on circumstances." *DiMarzo* v. *American Mut. Ins. Co., supra* at 103.

As the Land Court judge noted, "[t]here is no doubt that the passage of [St. 2006, c. 394, amending G. L. c. 61A § 14,] was intended to address the holding of *Wyllie*." The amendment specifically changed the definition of "bona fide offer" to preclude the contingencies or conditions that the Supreme Judicial Court had held in *Wyllie* were irrelevant to deciding whether the offer was a "bona fide" offer. See *Franklin* v. *Wyllie*, 443 Mass. at 194. Nonetheless, the change must be viewed in context; the amending statute contains fifty-one sections spread over twenty pages in the Acts and Resolves. It rewrote large portions of G. L. cc. 61, 61A, and 61B, chapters that deal respectively with

taxation of forest land, agricultural and horticultural land, and recreational land. The statutory changes ranged from minor, such as changed dates for calculating taxes, St. 2006, c. 394, §§ 9, 41, to major, such as definition changes like § 14, which changed the statute's reach and coverage.[9] See St. 2006, c. 394, §§ 2-6.

Even considered in isolation, the changes to G. L. c. 61A, § 14, itself were equally far-reaching. St. 2006, c. 394, § 31. In addition to creating a new definition of "bona fide offer," based for the first time on the offer's substantive content, the amendment to § 14 extended by one year the period during which sale or conversion of agricultural or horticultural land was restricted and deleted a provision stating that "discontinuance of the use of . . . land for agricultural or horticultural purpose shall not be deemed a conversion" of land that triggered § 14's appraisal provisions. The amendments also created a new appraisal mechanism and placed new restrictions on the amount of land that could be developed if the city or town elected to assign its option rights to a "nonprofit conservation organization or to the Commonwealth."

In addition, the amendments to § 14 were approved by the Legislature without an emergency preamble nearly two years after the holding in *Wyllie* was announced. That action was not so swift or immediate as to compel the conclusion that the Legislature intended primarily to correct a judicial misunderstanding of the previous language. Contra *Swift* v. *AutoZone, Inc.*, 441 Mass. at 449 (statutory amendment adopted by emergency preamble between Superior Court's decision and time briefs for appeal of decision were filed; "swift legislative action in the wake of the Superior Court judge's ruling . . . [was] strongly suggestive of the Legislature's [original] intent").

In sum, all the circumstances surrounding the amendment indicate that the new definition of "bona fide offer" was part of a broad legislative reappraisal of the way in which forest,

---

[9]Additional changes included an amendment to allow local governments to change the way the land is valued for purposes of taxation, St. 2006, c. 394, §§ 1, 20, 40, and a new mechanism to impose "rollback" taxes on land that is withdrawn from forest, horticultural, agricultural, or recreational use. St. 2006, c. 394, §§ 7, 29, 30, 46, 47.

agricultural and horticultural, and recreational land are to be taxed, managed, and preserved. The changes imposed significantly greater restrictions on an owner's use of agricultural or horticultural land and cannot reasonably be described as mere changes in procedures or remedies. There is no indication, in the text of the amendment or otherwise, that the Legislature intended the changes to apply retroactively to land like Woodman's, for which an offer had been made before the amendment was adopted. This case is thus controlled by the prior version of the statute, as interpreted by the Supreme Judicial Court in *Wyllie*, *supra*.

c. *Bona fide offer to purchase.* The issue that remains is whether Seaport's offer can be fairly distinguished from the offer in *Wyllie*, which the Supreme Judicial Court ruled was a bona fide offer, notwithstanding the contingencies it contained. The Land Court judge ruled that Seaport's offer and, thus, this case could be distinguished from *Wyllie* because of "the nature of the approvals specified in the 2005 agreement." In *Wyllie*, the proposal was for a conventional subdivision, and the necessary approvals were all available at the municipal level. The present case involves a proposal for a G. L. c. 40B development, which is, as the judge observed, "by its nature, typically one other than a conventional subdivision. In a community where less than an adequate inventory of low and moderate housing exists, dimensional regulations, including density, setback, and minimum area requirements, often are considered not consistent with local needs and overridden in securing a comprehensive permit. Thus, it is unpredictable whether a comprehensive permit will be granted, and, if so, for how many units."

The judge pointed out the difficulty presented to Newburyport in conducting its due diligence when evaluating whether a comprehensive permit could be obtained within the 120-day option period and stated that "a comprehensive permit is dependent upon actors outside the control of [Newburyport]." The record does not establish whether Newburyport could meet the necessary jurisdictional requirements to obtain a comprehensive permit and it appears likely that it would have to exercise its right of first refusal in order to demonstrate the requisite interest in the property. In addition, the proposal would necessitate some degree

of environmental review, likely at the State and possibly even at the Federal level.

The judge concluded, therefore, that Newburyport "[was] put in the position of having to accept a highly speculative conditional offer or lose its right of first refusal. As discussed above, a number of the conditions that must be satisfied [were] not within the control of [Newburyport's] employees or agents, and the time to complete the required due diligence [was] likely to extend well beyond 120 days." In addition, the judge noted Newburyport's argument that "the sum of $1,500,000 is unrealistic for property that could be developed only to a limited extent due to extensive wetlands on the site." He concluded, "Although *Wyllie* concerned a permissible form of a contingent purchase offer . . . the 2005 agreement tied to a [c.] 40 approval process is an unreasonable extension of the holding of *Wyllie* . . . [and thus,] the 2005 agreement is not a bona fide offer under § 14."

We need not explore in detail the Land Court judge's extensive analysis for, in the end, we think that the plain language of *Wyllie* precludes his result. In that case, the Supreme Judicial Court concluded that, "[i]n light of the unambiguous statutory language," the purchaser's position was "the more persuasive."

> "[A] 'bona fide offer to purchase' exists where the seller receives an enforceable offer, regardless [of] whether that offer includes contingencies or whether the ultimate purchase price depends on the actual number of lots approved. . . . [T]he existence of a number of contingencies does not make an agreement unenforceable, or any less of a 'bona fide offer,' because [the purchasers] are contractually obligated to use their best efforts to maximize the number of lots in the subdivision. . . . [I]mplicit in the concept of bona fide offer is the notion that, under a bona fide offer, a fair market value price is to be paid. Section 14 expressly provides that this fair market value will be determined by the bona fide offer (in the case, as here, of a third party sale) . . . . [A] valuation of the property's highest and best use requires an analysis of the maximum use which could be derived from the property. Further, when the proposed purchase is of undeveloped land

zoned for residential purposes, as here, any appraisal neces-
sarily takes into account the type of assessment called for in
the agreement."

*Franklin* v. *Wyllie*, 443 Mass. at 193.

The differences enumerated by the judge below — primarily
that what is proposed is a c. 40B development and not a con-
ventional subdivision, and that the development would require
approvals beyond the municipal level — do not alter the plain
fact that there was a binding agreement here between the buyer
and the seller, one that constituted a bona fide offer as that term
was defined in *Wyllie. Id.* at 194-196 ("The existence of con-
tingencies concerning obtaining approvals are common in real
estate transactions and do not make the agreement any less than
a bona fide offer. . . . [W]e conclude that there is nothing in
the extensive legislative history of G. L. c. 61A, the unambigu-
ous language of § 14, or in our cases interpreting that language
which would allow us to read into the statute terms an exclu-
sion for 'bona fide offers' contained in a fully executed and
enforceable purchase and sale agreement"). We are, therefore,
"constrained by the actual language of the statute" and the
controlling interpretation of the Supreme Judicial Court to con-
clude that Seaport in fact made a bona fide offer, triggering
Newburyport's obligation to match it. See *id.* at 196.

d. *Division of the two parcels.* Newburyport's final argument,
that it should be permitted to exercise its option to purchase at
fair market value only one of the two parcels, rather than both,
is also unpersuasive. In support of its position, Newburyport
cites only *Plante* v. *Grafton*, 56 Mass. App. Ct. 213, 214 (2002),
where this court held that "on the peculiar facts of [that] case,
owners may not put their parcels to the municipality under § 14
on an all or nothing basis."

In *Plante*, the parcels were not contiguous and "[t]here were
. . . separate sellers, separate closing dates, and disparate
financial terms." *Id.* at 215. In addition, we found it "probably
dispositive that [the sellers], who owned separate parcels, [had]
applied separately to have them classified as horticultural under
G. L. c. 61A" (footnote omitted). *Id.* at 217. Noting the "public
policy to encourage agriculture and horticulture in the Com-

monwealth and to keep land free of construction not related to agricultural or horticultural purposes," we concluded that "[t]hat policy may not be defeated through the contrivance of bundling landowners and lots so as to confront a municipality with the choice of surrendering all its rights to keep land free of construction development or imposing on it more expenditure for land than it can prudently tolerate." *Ibid.*

This case is very different. It involves one owner of two contiguous parcels with one agreement to sell the parcels together to one buyer for one project. "[T]o meet the purchaser['s] bona fide offer, the town was required to purchase the land on substantially the same terms and conditions as presented in the agreement. See *Stone* v. *W.E. [Aubuchon] Co.*, 29 Mass. App. Ct. 523, 527 (1990) ('It is basic, of course, that an option may be exercised only in strict compliance with its terms')" (footnote omitted). *Franklin* v. *Wyllie*, 443 Mass. at 195-196.

The judgment of the Land Court is reversed.

*So ordered.*

TRAINOR, J. (dissenting). This case raises important issues concerning a city or town's right of first refusal of property being removed from agricultural or horticultural protection pursuant to G. L. c. 61A, and the Supreme Judicial Court's decision in *Franklin* v. *Wyllie*, 443 Mass. 187 (2005). Since I disagree with the majority in both respects, I respectfully dissent.

The *Wyllie* court agreed with a judge of the Land Court that a purchase and sale agreement made contingent upon *conventional subdivision approval* fit within the meaning of a "bona fide offer" for the purposes of G. L. c. 61A. The Legislature immediately amended G. L. c. 61A, § 14, to specifically state that no contingency will be considered a "bona fide offer" for the purposes of the statute.[1]

The same judge of the Land Court hearing this case and

---

[1]Section 14 of G. L. c. 61A now reads in pertinent part:

"For the purposes of this chapter, a bona fide offer to purchase shall mean a good faith offer, not dependent upon potential changes to current zoning or conditions or contingencies relating to the potential for, or the potential extent of, subdivision of the property for residential use

applying the version of G. L. c. 61A in effect prior to the legislative amendment determined that this case was clearly distinguishable from the facts of his original decision and its affirmance in *Wyllie*. Here, the judge stated that "[e]ven before the passage of [St. 2006, c. 394 (the legislative amendment passed in reaction to the *Wyllie* decision),] the *Wyllie* court advised that § 14 'must be interpreted in a manner that will not frustrate or impair a town's right of first refusal.' *Wyllie*, 443 Mass. at 196. Here, the [c]ity [of Newburyport (city)] is put in the position of having to accept a highly speculative conditional offer or lose its right of first refusal. . . . [A] number of the conditions that must be satisfied are not within the control of the [c]ity's employees or agents, and the time to complete the required due diligence is likely to extend well beyond the 120 days."[2,3] The judge ruled that the contingencies involved here would constitute an unreasonable extension of the *Wyllie* decision and would successfully "frustrate or impair [the city's] right of first refusal." I agree with the Land Court judge that the contingencies contained in the purchase and sale agreement here do not represent a bona fide offer within the meaning of G. L. c. 61A.

The city makes an additional argument that was raised below but not reached by the Land Court judge and only summarily considered by the majority.[4] Consideration of this separate

or the potential for, or the potential extent of development of the property for industrial or commercial use, made by a party unaffiliated with the landowner for a fixed consideration payable upon delivery of the deed."

See St. 2006, c. 394, §§ 18, 31, 48.

[2]Under G. L. c. 61A, § 14, if the change in use is to come about by a sale of the property, the land owner must give the city or town a 120-day option to purchase the property on such terms as are contained in a bona fide purchase offer made to the owner.

[3]The first sentence of paragraph 11 of the purchase and sale agreement provides that "[i]f pursuant hereto, the BUYER does undertake efforts to obtain approval of the DEVELOPMENT, the BUYER shall have the right to terminate this agreement if it appears reasonably certain to the BUYER and BUYER'S legal counsel approval efforts will be unsuccessful." Seaport was fully aware of the speculative nature of these contingencies, even without a 120-day time frame, and protected itself contractually.

[4]The Land Court judge did not reach this question because his analysis of the purchase and sale agreement's contingencies was dispositive on the question of a bona fide offer. Also, the Legislature, by definitively amending the

argument is the basis for the dissent. The issue raised here, of a municipality's right of first refusal of individual parcels that are covered by the horticultural protection statute, is separate and distinct from the issue considered in *Wyllie*. The conclusion I reach on this question, however, while separate and standing alone, also necessarily requires that I reconsider whether a "bona fide offer" had been made by Seaport. In this way, separate from the issue considered by the *Wyllie* court and the majority here, Seaport continued its effort to frustrate and impair the city's right of first refusal by bundling the separate parcels of land in the purchase and sale agreement and by refusing to state a separate value for each parcel. The city was prevented from exercising its option on either parcel of land separately.

A municipality has a right of first refusal to purchase property that is being taken out of agricultural or horticultural use when the municipality has previously classified the property for such use pursuant to G. L. c. 61A, § 14. This case presents the same question raised in *Plante* v. *Grafton*, 56 Mass. App. Ct. 213 (2002). In *Plante*, we determined "whether a city or town may be forced by owners who propose to take two or more parcels out of agricultural or horticultural use to buy all of those parcels or whether the municipality may choose to acquire fewer than all of the lots the owners propose to remove from agricultural or horticultural use." *Id.* at 213-214.

The properties at issue here are two separate lots of land. The two lots were conveyed to Woodman by separate deeds, and those deeds were recorded separately. The lots were purchased at separate times, were enrolled in the program at separate times, and were taxed separately under G. L. c. 61A, § 14.[5]

I can discern no substantive difference between the facts in *Plante* and the facts of this case that would prevent the holding in *Plante* from being applied here. We determined in *Plante* that

statute, has prevented this kind of attack on a city or town's right of first refusal in the future. However, the issue raised by Seaport's attempt to extinguish any independent status of separate parcels of land pursuant to G. L. c. 61A has significant future importance to the operation of c. 61A.

[5]The majority distinguishes *Plante* from this case entirely on the basis that the two lots here are contiguously situated (in *Plante* they were not) and here the lots are owned by the same person (in *Plante*, Hennessey was the owner in fee of parcel I and the sole beneficiary of a trust that owned parcel II).

"[i]n consideration of the tax benefit that such a classification bestows upon the landowner, § 14 confers upon the municipality the right to keep the land from being developed. As to *each grant* of an application for agricultural or horticultural status, there is a refusal option in favor of the municipality. Ordinarily, a seller may not defeat a right of first refusal by confronting the optionee with terms that include acquisition of land in addition to that covered by the right. . . . The rationale of those cases is that permitting a seller so to do allows the seller, as optionor — as here — a too easy means to defeat the rights of the holder of the option right." (Emphasis added.) *Id.* at 217.

In addition, *Plante* held that "there inheres in art. 99 of the Massachusetts Constitution and the implementing statute, G. L. c. 61A, a public policy to encourage agriculture and horticulture in the Commonwealth and to keep land free of construction not related to agricultural or horticultural purposes. That policy may not be defeated through the contrivance of bundling landowners and lots so as to confront a municipality with the choice of surrendering all its rights to keep land free of construction development or imposing on it more expenditure for land than it can prudently tolerate." *Ibid.*

Finally, we concluded "that a landowner who, in accordance with G. L. c. 61A, applies for, and receives, classification of a particular parcel of land as agricultural or horticultural may not defeat the option of first refusal conferred in G. L. c. 61A, § 14, by inserting terms that require the municipality to acquire more than that particular parcel of land." *Id.* at 218.

Here, the city, pursuant to G. L. c. 61A, § 14, should have the option to purchase either or both of the subject parcels. The purchase and sale agreement improperly treats the two parcels as one plot of land. The agreement neither sets a separate price for each of the separate parcels nor allocates proposed development units to each of the parcels. By structuring the agreement in this way, Seaport seeks to do more than simply frustrate and impair the city's right of first refusal; it seeks to outright prevent the city from purchasing one, but not both lots, if it should choose to do so. It is impossible for the city to determine a purchase price for one, if not both, of the parcels. We should not approve an agreement that so clearly attempts to undermine and

subvert the remedial purpose of G. L. c. 61A. Since the agreement does not represent a bona fide offer and, in addition, prevents the city from exercising its right to purchase either, if not both, of the parcels, the Land Court judge's entry of summary judgment should be affirmed.