SOUTH BOSTON BETTERMENT TRUST CORPORATION &
another[1] *vs.* BOSTON REDEVELOPMENT AUTHORITY & others.[2]

Suffolk. September 4, 2002. - October 31, 2002.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, & SOSMAN, JJ.

*Public Officer. Municipal Corporations,* Officers and agents, Contracts, Mayor.
*Contract,* Validity, Interference with contractual relations. *Zoning,* Linkage.

A Boston city councillor, a State representative, and a State senator, acting in
their respective capacities as elected officials, lacked authority to negotiate
and execute, on behalf of the city council and Legislature as a whole, a
binding memorandum of understanding concerning the distribution, to
residents of South Boston, of certain community benefits obtained from
developers in connection with a convention center project in that area.
[63-64]

Discussion of St. 1987, c. 371, the legislation authorizing the Boston
Redevelopment Authority to require community benefits, commonly known
as linkage, from certain developers, and the related regulations contained
in art. 80, § 80B-7 of the Boston Zoning Code. [64-67]

The Boston Redevelopment Authority (BRA) lacked authority to negotiate
and execute a binding memorandum of understanding (MOU) concerning
the distribution, to residents of South Boston, of community benefits
obtained from developers in connection with a convention center project in
that area, where the terms of the MOU violated the statutory and regula-
tory scheme set forth in art. 80 of the Boston Zoning Code and St. 1987,
c. 371, for the BRA's procurement of community benefits from developers.
[67-68]

A Superior Court judge properly granted summary judgment in favor of the
mayor of Boston on a claim that he tortiously interfered with contractual
and prospective advantageous relationships, where the admissible evidence
failed to establish that the mayor's alleged interference (i.e., his official
acts, done in good faith, to point out to others the invalidity of the contract
on which the advantageous relationships were based) was improper. [68-70]

CIVIL ACTION commenced in the Superior Court Department on
September 12, 2000.

The case was heard by *Allan van Gestel,* J., on motions for
summary judgment.

---

[1]The city councillor for district 2 of the Boston city council.

[2]The director of the Boston Redevelopment Authority (BRA) and the mayor
of Boston, individually.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Alan M. Spiro* (*Donna M. Greenspan*, of Florida, with him) for South Boston Betterment Trust Corporation.

*Chester Darling* for the city councillor for district 2 of the Boston city council.

*Michael K. Fee* (*Martha J. Collins* with him) for the mayor of Boston.

*Saul A. Schapiro* (*Nina F. Lempert* with him) for Boston Redevelopment Authority & another.

*Erica B. Abate Recht*, for South End Lower Roxbury Housing & Planning Coalition & others, amici curiae, was present but did not argue.

GREANEY, J. We transferred this case here on our own motion to decide whether a Boston city councillor, a State representative, and a State senator, acting in their respective capacities as elected officials, may negotiate and execute, with the Boston Redevelopment Authority (BRA), a binding memorandum of understanding (MOU) that created the South Boston Betterment Trust Corporation (trust) and authorized the trust to receive, and then to provide to residents of the South Boston section of Boston, certain community benefits obtained from developers in connection with the convention center project in South Boston. A judge in the Superior Court allowed the defendants' motions for summary judgment, concluding that the MOU was unenforceable. The judge also concluded that summary judgment was appropriate on the plaintiffs' claims against the mayor, stemming, essentially, from his alleged disavowal of the MOU and alleged interference with business deals, or prospective business deals, made pursuant to the MOU. We affirm.

The record establishes the following relevant undisputed facts. In 1997, the Legislature authorized the financing and construction of a new convention and exhibition center in South Boston. St. 1997, c. 152, §§ 1, 2. The legislation authorized the BRA to acquire certain land in South Boston and to convey that land to the Massachusetts Convention Center Authority (MCCA) for construction and operation of a convention and exhibition

center. *Id.* at §§ 1, 2, 3 (*a*), 3 (*e*). All costs incurred by the BRA in acquiring land and other property interests for the convention center were to be borne by the city of Boston. *Id.* at § 3 (*f*). The project required, among other conditions, the approval of both the mayor and the city council, by March 11, 1998. *Id.* at §§ 4 (*a*), 13 (*a*).

The mayor approved the project and forwarded its development plan to the city council, which gave the project its initial approval. On March 11, 1998, the then director of the BRA, Thomas N. O'Brien, on behalf of the BRA, executed the MOU with Boston City Councillor James M. Kelly, State Senator Stephen F. Lynch, and State Representative John A. Hart, Jr. (the elected officials). Kelly, Lynch, and Hart signed the MOU in their respective official capacities as elected representatives of the citizens of South Boston. Later that day, the city council gave its final required approval of the project. On March 19, 1998, the BRA formally approved and ratified the MOU at its annual meeting.

The MOU is a six-page document containing five articles. The MOU concerns "benefits to the residents of South Boston," as these residents "will be most impacted" by the development resulting from the convention center project. The MOU calls for the establishment of "a charitable organization to be known as the South Boston Betterment Trust . . . which . . . shall, in perpetuity, be the beneficiary of community benefits established pursuant to this MOU or to any agreements related to development in the Seaport District." The MOU provides that the directors of the South Boston Betterment Trust "shall be residents of South Boston (including but not limited to its elected officials and other neighborhood leaders), selected by such officials and leaders."

Article 1 of the MOU contains definitions. Article 2 concerns employment and job training, art. 3 concerns housing, and art. 4 concerns zoning and design. Article 5 contains several "miscellaneous" matters, including a statement concerning the document's "[b]inding [e]ffect," which provides: "This MOU is a legally binding document having the full force and effect of the law between the parties and their successors in office, assignees and agents, and shall be enforceable by the signatories

hereto in a court of law by equitable relief, but shall create no rights hereunder in any party not a signatory hereto."

As to employment and job training, the MOU provides, in pertinent part:

> "The BRA, working with the Neighborhood Jobs Trust, shall establish an aggregate annual goal of allocating no less than a majority of job linkage deriving from development within the Seaport District pursuant to Article 26B of the Boston Zoning Code, as a community benefit to residents of the Impacted Neighborhood, with the intention that such job linkage promote the job training and employment for residents of the Impacted Neighborhood and provide employment-related education scholarships for students from such Impacted Neighborhood."

As to housing, the MOU provides, in pertinent part:

> "3.1 *Housing Linkage.* The BRA, working with the Neighborhood Housing Trust, shall establish an annual aggregate goal of allocating no less than a majority of housing linkage deriving from development within the Seaport District pursuant to Article 26A of the Boston Zoning Code, as a community benefit to residents of the Impacted Neighborhood, for the purposes of developing affordable housing in the Impacted Neighborhood and assisting senior citizens, first time homebuyers and others who are residents therein with their housing needs.
>
> ". . .
>
> "3.3 *Encouragement of Site Purchases.* The BRA shall use its best efforts, through cooperation agreements or otherwise, to include as a component of community benefits deriving from the Seaport District development a requirement that sites in the Impacted Neighborhood be purchased by the developer on behalf of the Trust for the development of affordable housing in the Impacted Neighborhood."

Finally, as to zoning and design, the MOU provides, in pertinent part:

> "*Height Limitation.* The BRA shall petition the Boston Zoning Commission to establish in the Seaport District a maximum as-of-right building height of one hundred fifty

(150) feet. The BRA shall include a height limitation of no more than one hundred fifty (150) feet in its final Master Plan for Seaport District zoning, to ensure the residents of the Impacted Neighborhood that no developer (including, without limitation, the MCCA) may construct a building in the Seaport District in excess of one hundred and fifty (150) feet in height without such developer first (i) completing in the Impacted Neighborhood a public community review process; (ii) executing a written agreement obligating said developer to deliver certain benefits to the Impacted Neighborhood as discussed during the community review process; and (iii) either filing a Development Area development plan or master plan with and acceptable to the [authority] (if such plan is required pursuant to Article 80 of the Boston Zoning Code or the Seaport District Master Plan, in which case the aforesaid benefits agreement shall be incorporated therein), or obtaining a variance or a conditional use permit from the City of Boston Board of Appeal which shall incorporate the aforesaid benefits agreement."

A little over one year after the MOU's execution, the trust, a nonprofit charitable corporation, was created as contemplated by the MOU. In accordance with the trust's bylaws, five designated individuals, one of whom was the mayor, each appointed three members to the trust's board of trustees.

On May 24, 2000, an article appeared in the Boston Globe newspaper that suggested that the trust and Kelly were being overly aggressive with developers and extorting benefits to enable South Boston to collect a windfall from the development generated by the convention center project. The article also criticized the mayor (who allegedly directed O'Brien to sign the MOU on the behalf of the BRA, despite O'Brien's misgivings concerning the fairness of the agreement to other neighborhoods in Boston) for failing to police the situation.

The mayor subsequently drafted and sent two letters, one circulated to developers in the Seaport District, and one sent to Kelly. The letters appeared on letterhead of the "Office of the Mayor." The letter to developers instructed: "any agreement that is made without the involvement and approval of the City will have no legal bearing on the City's approval of a pending

project. I will not allow any side deals that enrich one entity to the detriment of others, or the public interest." The mayor clarified that the MOU reflected nothing more than the standard practice of assigning linkage benefits to the most heavily impacted community through the BRA's procedures. In his letter to Kelly, the mayor advised Kelly of the essence of his letter to the developers, and stated that linkage benefits "*must* be fairly allocated" (emphasis in original). The mayor explained, "I will not allow approval of any arrangement that distorts the legitimate development process or the necessary role of community input. To do so would betray the trust put in us as public officials to pursue the common good."

A few months later, the trust and Kelly commenced this litigation. They claim in the main that O'Brien executed the MOU at the direction of the mayor, and that both the mayor and BRA "have reneged on their promises," and have "interfered with existing contractual rights and prospective advantageous relations with which they have no right to interfere." The first amended complaint contains seven counts: count I seeks a declaration that "the MOU is a valid, binding and enforceable contract"; count II asserts breach of contract and the implied covenant of good faith and fair dealing against the BRA; count III asserts tortious interference with contract against the mayor in his individual capacity; count IV asserts tortious interference with the trust's contractual and prospective advantageous relations against the mayor individually; count V asserts fraudulent inducement against the mayor and the BRA; count VI seeks, against the BRA, specific performance of the MOU; and count VII seeks injunctive relief preventing the mayor and BRA from interfering with the plaintiffs' contractual and prospective advantageous relations.

The BRA and its current director moved for summary judgment on all counts of the complaint, and the mayor moved for summary judgment on all counts against him, namely, counts III, IV, V, and VII. A judge in the Superior Court allowed the motions. He concluded, for reasons we that we need not summarize here, that, as matter of law, the MOU was not enforceable, and that, therefore, counts II, III, VI, and VII could not survive. The judge also concluded that counts III and IV of the

complaint could not stand, as matter of law, against the mayor because the undisputed facts revealed that the mayor had acted in his official capacity, thereby enjoying immunity from liability. Finally, the judge concluded that count V lacked legal merit, reasoning that the trust could not claim it had been fraudulently induced to execute the MOU because it had not been a party to the MOU, and that the "real thrust" of Kelly's case was that the MOU was a valid agreement, "not one that failed because of a fraud in the inducement."[3]

1. The defendants argue that the trust lacks standing under the MOU to enforce its terms. They point to language in art. 5 of the MOU stating that the MOU "shall create no rights hereunder in any party not a signatory hereto." Assuming (without deciding) that the trust lacks standing to enforce the MOU because it is not a "signatory," Kelly is a signatory. Where at least one plaintiff has the requisite standing, we proceed to decide the merits.

2. We conclude that the MOU is unenforceable because the elected officials and the director of the BRA lacked authority to enter into the purported contract. First, the elected officials who signed the MOU have no power to act on behalf of, in Kelly's case, the city council as a whole, and in Lynch's and Hart's cases, the Legislature as a whole. Kelly is permitted to act as a city councillor only as authorized by statute. The city council is the legislative body of the city. St. 1948, c. 452, § 11, as appearing in St. 1951, c. 376, § 1. The city council's authority is limited, see, e.g., St. 1948, c. 452, § 17G, inserted by St. 1951, c. 376, § 1 ("neither the city council nor any member . . . thereof shall directly or indirectly on behalf of the city or the county of Suffolk take part in . . . the making of contracts"), and a majority, or two-thirds of its members, is required for it to act (depending on the matter or posture of the matter before it). St. 1948, c. 452, §§ 17, 17D, inserted by St. 1951, c. 376, § 1. As such, Kelly is authorized to represent his constituents *in the city council*, but he has no authority to bind the city council to any action, even assuming the action is one that the city

---

[3]Though noting that the affidavits submitted by the plaintiffs in opposition to summary judgment may have contained hearsay, the judge took no action on the defendants' motion to strike those affidavits.

council is authorized to take, in the absence of quorum. Similarly, Lynch and Hart may represent their constituents *in the General Court*, but each may act only in the manner established pursuant to the State Constitution, see art. 30 of the Massachusetts Declaration of Rights; Part II, c. 1, §§ 1-3 of the Constitution of the Commonwealth; *Opinion of the Justices*, 303 Mass. 615, 623-624 (1939), which does not contemplate the actions taken by them in executing the MOU.

In addition, the BRA had no authority to execute the MOU. This conclusion requires a close examination of the legislation, St. 1987, c. 371, authorizing the requirement of community benefits, commonly known as linkage, from developers. There is no authority for the BRA to extract community benefits from developers in a manner that is not permitted by St. 1987, c. 371.

In 1956, the Legislature established the Boston zoning commission (commission) and authorized the commission to adopt a zoning regulation to which it was also empowered to make amendments. St. 1956, c. 665, §§ 1-3. Subsequently, the commission adopted the Boston Zoning Code, which became effective in 1964. See St. 1964, c. 244. In 1987, the Legislature, by St. 1987, c. 371, amended the commission's enabling act, St. 1956, c. 665, to insert §§ 15-20, which established Boston's linkage program. St. 1987, c. 371, § 3.

Certain provisions of the linkage program are relevant to this appeal. Under the linkage program, the commission was authorized to adopt zoning regulations to condition zoning relief for developers of "new large-scale commercial real estate" "upon action, or promised action, by the developer" to contribute an "affordable housing exaction" and "employment exaction" to mitigate the effects of the project "upon the availability of affordable housing within the city" and "upon the availability of jobs for low and moderate income residents of the city." St. 1987, c. 371, §§ 16, 17. The act defines an "[a]ffordable housing exaction" as "a contribution towards the creation of affordable housing by a developer whether in kind, or by the payment of a sum of money in lieu thereof by said developer to the neighborhood housing trust; or a combination of such creation and monetary payment; all made in accordance with regulations promulgated by the Boston zoning

commission." *Id.* at § 15. An "[e]mployment exaction" is defined as "a contribution by a developer towards the creation of a job training program or programs whether by the creation of such program or the payment of a sum of money in lieu thereof by said developer to the neighborhood jobs trust; or a combination of such creation and monetary payment; all made in accordance with regulations promulgated by the Boston zoning commission." *Id.* The "[n]eighborhood housing trust" is defined as "a Massachusetts public charitable trust created under the authority of this act and the laws of the commonwealth and administered by the collector-treasurer of the city as managing trustee pursuant to chapter seven of the ordinance of the city of Boston of nineteen hundred and eighty-six and pursuant to a declaration of trust dated November nineteenth, nineteen hundred and eighty-five." *Id.* The "[n]eighborhood jobs trust" is defined as "a Massachusetts public charitable trust created under the authority of this act and the laws of the commonwealth and administered by the collector-treasurer of the city as managing trustee." *Id.*

The commission was authorized under the linkage program to adopt regulations concerning the affordable housing and employment exactions. *Id.* at §§ 16, 17. However, a maximum amount was established with respect to both of those exactions. *Id.* It was also required that "[a]ny affordable housing exaction payment shall be made to the neighborhood housing trust," and that "[a]ny employment exaction shall be paid into the neighborhood jobs trust . . . ." *Id.* These provisions concerned money payments only, and not contributions toward the creation of affordable housing. *Id.* at § 20.

Section 80B-7 of art. 80 of the Boston Zoning Code (code) represents the commission's regulations concerning linkage. Mirroring St. 1987, c. 371, this section of the code requires from developers a "[h]ousing [e]xaction" and a "[j]obs [c]ontribution [e]xaction." The housing exaction may be satisfied by the payment of a "[h]ousing [c]ontribution [g]rant," the creation of housing units, or a combination of both. Similarly, the jobs contribution exaction may be satisfied by the payment of a "[j]obs [c]ontribution [g]rant," the creation of a job training program, or a combination of both. The amount of each

exaction is established in the code, as well as a payment schedule. There are also "allocation" provisions concerning the donation of a housing contribution grant or jobs contribution grant. The former requires: "No less than ten percent (10%) of any Housing Contribution Grant made for Proposed Projects located in the area described in [an appendix] to this Article, and twenty percent (20%) of any Housing Contribution Grant made for Proposed Projects located outside such area, shall be reserved for use in the area surrounding the Proposed Project that is directly affected by the housing impacts of the Proposed Project . . . provided that the Neighborhood Housing Trust finds that proposals for feasible housing projects can be developed in such area." With respect to the jobs contribution grant, the allocation provision states: "No less than twenty percent (20%) of any Jobs Contribution Grant shall be reserved for use in the area surrounding the Proposed Project, as that area is set forth in the agreement . . . ."

If a developer chooses to satisfy the housing exaction by creating units, that option "shall be met by creating, or causing to be created, housing units for occupancy exclusively by low and moderate income residents of the City, at a cost at least equivalent to the amount of the Housing Contribution Grant, and in conformity with written regulations adopted by the Boston Redevelopment Authority after public notice and hearing. The actual Housing Creation Contribution may be approved by the Authority only after public notice and hearing." With respect to the creation of a job training program, the code provides: "Upon approval by the Director of the Mayor's Office of Jobs and Community Services, or any successor office thereto, the Applicant may use the Jobs Contribution Grant to create a job training program for workers who will be employed, on a permanent basis, at the Proposed Project."

The code also provides that all payments made pursuant to the exactions "shall be made to the Collector-Treasurer, as the managing trustee of the Neighborhood Housing Trust, or as the managing trustee of the Neighborhood Jobs Trust, as the case may be, for the exclusive benefit of the Neighborhood Housing Trust and the Neighborhood Jobs Trust, respectively." The code, however, permits the creation of other trusts to administer exac-

tion payments so long as such trust is "passed by the City Council and approved by the Mayor."[4] Last, where a "combination" exaction is chosen by the developer (that is, a combination of either the creation of housing or a job training program together with a monetary contribution), the developer's monetary contributions are governed by the allocation provisions of the code.

Against this background, we turn to the MOU. The MOU designates the trust as the "beneficiary of community benefits established pursuant to this MOU or to *any* agreements related to development in the Seaport District" (emphasis added), without an assignment of rights from, or transfer of trust property from, the trustees of the Neighborhood Housing Trust or trustees of the Neighborhood Jobs Trust. There is no evidence that the trust was "passed by" the city council (as previously explained, Kelly's execution of the MOU could not bind the city council), or "approved" by the mayor as contemplated in art. 80. Article 80 does not permit the trust's designation in these circumstances, and the BRA lacked authority to circumvent St. 1987, c. 371, or art. 80's provisions. By doing so, the parties created a political document that expressed aspirational goals, but which violated public policy and is unenforceable. We also add that the BRA lacked authority to establish the allocation of linkage funds according to the MOU's provisions. Under art. 80, that responsibility is delegated to the trustees of the Neighborhood Housing Trust and Neighborhood Jobs Trust, as limited by art. 80. Further, under art. 80, the MOU could not eliminate the developer's option of paying a "housing contribution grant" to satisfy the housing exaction, by, as provided by the MOU, requiring "that sites in the Impacted Neighborhood be purchased by the developer on behalf of the Trust for the development of affordable housing in the Impacted Neighborhood." Finally, we reject the plaintiffs' contention that G. L. c. 121B, §§ 1, 9, 11 (*l*), which provide that the BRA may "enter into, execute and carry out contracts and all other instruments necessary or convenient to the exercise of the powers granted in this chapter," authorized execution of the MOU.

---

[4]We are not called upon in this case to decide whether this provision of the Boston Zoning Code violates St. 1987, c. 371, § 3, in any manner. Thus, we assume, without deciding, that it is a lawful provision.

In sum, the signatories to the MOU lacked authority to execute the MOU. Article 80, as authorized by St. 1987, c. 371, carefully delineates the requirements of Boston's linkage program. Authorized community benefits may only be required from developers generally in accordance with the provisions of art. 80 and St. 1987, c. 371. Because the MOU clearly violates the statutory and regulatory scheme, it is unenforceable. Our conclusion requires that the entry of summary judgment in the defendants' favor on counts I, II, III, VI, and VII, be affirmed.

3. We turn now to count IV. The judge granted summary judgment to the mayor on count IV. That count asserted that the mayor individually (and not in his official capacity as mayor) had tortiously interfered with the "[t]rust's contractual and prospective advantageous relationships [with developers], thereby damaging the [t]rust in the amount of millions of dollars." In granting summary judgment on the claim, the judge concluded essentially that the mayor was acting solely in his official capacity as mayor and, as such, enjoyed immunity for discretionary acts such as the acts challenged here as tortious.

It is undisputed that the mayor is being sued individually. The record also establishes that all of the mayor's acts and conduct were committed and performed in his official capacity as mayor. There is no question as well that, as mayor, the mayor was charged with certain duties vis-à-vis the BRA, the development of the convention center and in the Seaport District, the obligations and rights of the developers, and the rights and expectations of the other sections and districts of the city and the city's inhabitants. For example, the mayor appoints four out of the five members of the board of the BRA; was required to approve of the convention center project before it could be implemented, see St. 1997, c. 152, § 4 (*a*); is required, as chief executive officer of the city, to "be vigilant and active at all times in causing the laws for the government of the city to be duly executed," *Nichols* v. *Boston*, 98 Mass. 39, 44 (1867); and is required by the city charter to "secure the honest, efficient and economical conduct of the entire executive and administrative business of the city, and the harmonious and concerted action of the different departments," as well as to supervise and control "the several officers and boards of the city in their respective departments," St. 1885, c. 266, § 6.

Because the mayor has been sued individually for an intentional tort, G. L. c. 258 does not apply. G. L. c. 258, § 10 (*c*). At common law, a public official like the mayor would not have been liable "for negligence or other error in the making of [an official] decision" if the official acted "in good faith, without malice and without corruption." *Gildea* v. *Ellershaw*, 363 Mass. 800, 820 (1973). The mayor's conduct and actions are covered by the rule that "[t]here is every presumption in favor of the honesty and sufficiency of the motives actuating public officers in actions ostensibly taken for the general welfare." *Foster from Gloucester, Inc.* v. *City Council of Gloucester*, 10 Mass. App. Ct. 284, 294 (1980). There is no *admissible* evidence in the summary judgment record that would justify a trial on whether the mayor acted in bad faith, corruptly, or with malice.

As has been discussed above, the MOU is void and unenforceable. As such, there can be no liability on the mayor's part for allegedly interfering with it. See Restatement (Second) of Torts § 774 comment b (1979) ("Illegal agreements and those in violation of public policy are commonly held to be entirely void and so not contracts at all. On that basis they are simply not within the rules . . . on liability for interference with the performance of contracts and there is no liability for causing their breach"). The "advantageous relationships" claimed by the trust are those with certain developers. Those relationships are dependent upon, and derivative of, the MOU. The admissible material in the summary judgment record establishes that the mayor's challenged conduct, in essence, rested on his official acts, executed in good faith, to point out to the developers, and others, that the MOU was unenforceable, and that developers, in particular, should not engage in forming separate relationships, or in executing separate contracts, with the trust outside of legal channels through the artifice of the MOU. The trust has failed to raise a genuine issue by admissible evidence that the mayor's alleged "interference" was improper. Restatement (Second) of Torts, *supra* at §§ 766B, 767 (requiring "improper" interference). *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. 811, 816 (1990) (requiring "improper" interference, as the term "improper" is used in the Restatement [Second] of Torts, *supra* at § 766B, as an element in the tort of

intentional interference with a prospective contractual relationship). Summary judgment was properly granted on count IV.

4. The plaintiffs do not challenge the judge's grant of summary judgment in favor of the defendants on count V. The dispositions made above completely dispose of the case. The judgment is amended to declare that the MOU is unenforceable and, in all other respects, the judgment is affirmed.

*So ordered.*