NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

25-P-28                                          Appeals Court

  GRAFTON & UPTON RAILROAD COMPANY  vs.  EDWARD BURT & others.[1]


                          No. 25-P-28.

     Worcester.      October 9, 2025. – February 12, 2026.

            Present:  Vuono, Desmond, & Toone, JJ.


Immunity from Suit.  Unlawful Interference.  Massachusetts Civil
     Rights Act.  Malice.  Railroad.  Municipal Corporations,
     Water supply.  Practice, Civil, Motion to dismiss.



     Civil action commenced in the Superior Court Department on
April 16, 2024.

     A motion to dismiss was heard by J. Gavin Reardon, Jr., J.


     Andrew P. DiCenzo for the plaintiff.
     David S. Mackey (Sean M. Grammel also present) for the
defendants.


     DESMOND, J.  Every day, municipal officials throughout the

Commonwealth make discretionary decisions to further and promote

_____

     [1] Timothy Watson, John Doe, and Jane Doe.  The defendants
are sued solely in their individual capacities.  John and Jane
Doe are alleged to be employees or public officials of the town
of Hopedale.

the interests of their towns and cities.  Our courts have long protected the rights of public employees acting within the scope of their employment to do their work without fear of liability. In fact, under the common law, municipal officials performing acts ostensibly for the good of the public welfare are presumed to be acting honestly and in good faith.  See South Boston Betterment Trust Corp. v. Boston Redev. Auth., 438 Mass. 57, 69 (2002).

Between the summer of 2022 and the spring of 2023, the defendant, Edward Burt, the chair of the water and sewer commission of the town of Hopedale (town or Hopedale), called and sent a series of e-mail messages primarily to the United States Environmental Protection Agency (EPA), which was then overseeing a major "Superfund" remediation and cleanup project with ties to Hopedale.[2]  See 42 U.S.C. §§ 9601-9675, the Comprehensive Environmental Response, Compensation, and Liability Act; G. L. c. 21E.  In those communications, Burt expressed his concerns about the potential impact on Hopedale's water supply from the role of Grafton & Upton Railroad Company (Grafton & Upton) in the cleanup project -- specifically the transfer of contaminated soils from trucks to trains in

---

[2] Hopedale is a small town in Worcester County that had a population of 6,017 as of the 2020 Massachusetts census.

Hopedale. After Grafton & Upton lost its subcontract on the project, it commenced this action against Burt as well as Timothy Watson, the manager of the town's water and sewer department, seeking to hold them personally liable under intentional tort and other theories for millions of dollars in lost anticipated revenue.[3] After a hearing, a judge of the Superior Court concluded that Grafton & Upton's allegations failed to state a plausible claim that Burt and Watson acted in bad faith, with malice, or with corruption so as to lose their common-law immunity. The judge further concluded that Grafton & Upton's allegations were insufficient to plausibly suggest that any interference with Grafton & Upton's constitutional rights was accomplished by "threats, intimidation or coercion," a required element of its Massachusetts Civil Rights Act (MCRA) claims. See G. L. c. 12, §§ 11H, 11I. Consequently, the judge dismissed the complaint. We affirm.

---

[3] In its first amended complaint, Grafton & Upton raised parallel claims against Burt and Watson of intentional interference with contractual relations, intentional interference with advantageous business relations, and violation of the Massachusetts Civil Rights Act. It also asserted a single count of conspiracy against Burt, Watson, John Doe, and Jane Doe. The town is not a named defendant in the first amended complaint, and Grafton & Upton make no arguments regarding the Doe defendants on appeal. All claims against the town, John Doe, and Jane Doe, therefore, have been waived. See Nelson v. Salem State College, 446 Mass. 525, 527 n.2 (2006).

Background.  We recite the well-pleaded allegations from
the first amended complaint and the documents relied upon by
Grafton & Upton in drafting it, which in this case consists of a
substantial number of e-mail messages.  See Porter v. Board of
Appeal of Boston, 99 Mass. App. Ct. 240, 243-244 (2021).  We
reserve some allegations for the discussion.

Concord is home to the Nuclear Metals, Inc. (NMI),
Superfund site (site).  For decades, NMI produced depleted
uranium and ultimately contaminated the site.  Administered by
the EPA's Superfund program, the long-term remediation of the
NMI site (project) began around 2001 and includes the expected
removal of over 100,000 tons of contaminated soils and
materials.

Since at least 2020, the EPA and the Massachusetts
Department of Environmental Protection (DEP) have overseen the
project, including the removal of contaminated soil from the
site.  The general contractor on the project, de Maximis, Inc.
(de Maximis), retained US Ecology, Inc. (US Ecology), as the
transportation and disposal subcontractor.  US Ecology in turn
entered into an exclusive, three-year contract with Grafton &
Upton to provide transloading services at its facility in
Hopedale (facility or railyard) as well as rail transportation.[4]

---

[4] Grafton & Upton, a short-line rail carrier with rail lines
that run through several Massachusetts towns, owns and operates

In October 2021, de Maximis and US Ecology finalized a transportation and offsite disposal plan (transportation and disposal plan) that called for Grafton & Upton to provide the first leg of rail transportation from Hopedale to North Grafton; and from there, the contaminated soil would be carried to its final destination at a Michigan landfill.  The EPA and the DEP approved the plan.

The complaint alleged that since around 2014, Burt and Watson have harbored "personal animosity" and "ill-will" toward Grafton & Upton and its principal, Jon Delli Priscoli.  For example, during his presentation to an unknown group in 2019, Burt asked,

> "What can Hopedale do to gain environmental justice against the Federal Transportation Act that exempts interstate railroads from any restrictions by the towns they occupy?  First of all, this is not interstate railroad.  [Grafton & Upton] is [a] local, 16-1/2 mile railroad that serves Grafton, Upton, and Hopedale. . . .  What can we do to oppose the railroad's hegemony?"

Burt historically opposed projects and developments proposed by Grafton & Upton in the town, writing with regard to one project,

> "Before that, the railroad planned development behind our factory that would have resulted in population of working couples, singles and small families.  The selectmen were working with the railroad to map out one- and two-bedroom

___

transloading facilities in Upton, North Grafton, and Hopedale. A significant part of Grafton & Upton's business is transloading, which, for purposes of this case, is the transfer of materials between trucks and rail cars for transportation out of the area.

condos.  The additional population would place strain on our services.  Townspeople voted it down, but the selectmen are still advocating for it.  For so many reasons, <u>we need the railroad to back off</u>" (emphasis added).

In August 2022, after Burt first reached out to the EPA requesting more information about the plan to transport the contaminated soil from Concord to Hopedale, Christopher Smith, the EPA official managing the NMI site, suggested a meeting by telephone between the "Town" and the EPA, the DEP, and a de Maximis representative.  After the meeting was held on August 22, 2022, Burt sent e-mail messages "on behalf of the Hopedale community" thanking all the officials who had attended and expressing his appreciation for their "attention to our concerns."[5]  Smith responded by e-mail, thanked Burt and the group for meeting with the EPA, stated that they would be in touch moving forward, and noted that the transportation and disposal plan was "subject to be updated if circumstances changed."  In a follow-up e-mail message to Smith, Burt commented on the transportation and disposal plan and asked

---

[5] According to Burt's notes from the meeting, which he attached to one of the e-mail messages, "[m]ost of the concerns related to this transport [were focused] on the 'what if's, the accidents' and the associated contingencies."  The notes reflected that "[p]er [Grafton & Upton's] past practice," the town expected that Grafton & Upton would "not allow any oversight, or establish systematic emergency procedures unless directed to by a federal level agency."  Burt asked Smith to "[p]lease edit, correct, add to" his notes "if anything is misstated or missed."

questions about it, including whether the EPA would consider a more direct shipping route for the NMI materials that would exclude Hopedale altogether, stating, "Sorry -- had to ask."

On October 5, 2022, Burt sent an e-mail message to Smith asking why "EPA/DEP are allowing [prohibited] contaminated soils within Hopedale's Zone II[6]" (Zone II protected area). As he prepared for an upcoming water and sewer commission meeting, Burt requested that Smith confirm that certain safety and emergency procedures for the transport would be implemented before shipments began. In response, Smith explained that the revised transportation and disposal plan -- updated at Burt's request -- now reflected that Grafton & Upton's Hopedale transloading facility was located in the town's Zone II protected area; however, Smith continued, the EPA was unaware of any EPA or DEP regulations prohibiting the shipment of contaminated soils through such areas, and although the soils were contaminated, they did not constitute "hazardous waste" for

---

[6] A release of hazardous materials on a site located in a "Zone II" protected area (a term further defined in the Massachusetts Contingency Plan regulations) poses a risk to a public water supply and is subject to special cleanup requirements. See generally Peterborough Oil Co. v. Department of Envtl. Protection, 474 Mass. 443, 446-447 & n.7 (2016).

purposes of Massachusetts statutory and regulatory law that would prohibit Grafton & Upton's activities.[7]

On October 24, 2022, Burt contacted Kara Kelly Nierenberg, Smith's successor, to explain that "progress ha[d] been made" regarding the town's issues, but "there were still concerns to be addressed."[8]  Burt acknowledged the clarification from the EPA and the DEP that the contaminated soils were not considered hazardous waste and that transloading was not a prohibited activity.  Burt stated that because Grafton & Upton "does not provide Hopedale with any information regarding the activities within the railyard . . . we are dependent upon the EPA to ensure the overall safety of this Zone II water protected area."

Some of Burt's concerns were realized when, in the course of the first delivery, three "zipper shut" bags opened during the transloading process, spilling a "minor" amount of contaminated soil in the town's Zone II protected area.  Indeed, Nierenberg later indicated that forty percent of the bags were

---

[7] A DEP official also reported to Burt that the contaminated soils being transported to Grafton & Upton's railyard were not considered hazardous waste and explained that the materials would arrive in Hopedale in "fully sealed containers" and would not be stored at Grafton & Upton's facility.

[8] For example, Burt pointed out that there were still "no site precautions, such as ground area protective barriers, nor any systematic emergency procedures reflecting the importance of [the] Zone II water protected area."  Burt stated that the presence of the soil at the railyard remained "a major concern."

tearing during rail to truck transfers.  In his ensuing e-mail messages to Nierenberg on November 21 and November 23, 2022, Burt continued to reiterate the concerns of the town, including those about the lack of "Zone II specific measures," the "lack of local oversight," and local officials' "inability to perform their public safety responsibilities."  He also continued to ask many questions, including some from the Hopedale conservation commission, about topics such as the spill, the trucking route, the malfunctioning packaging, and emergency procedures.  As he had done previously and would continue to do, Burt copied a number of town officials on his e-mail messages.  Burt asserted that a number of local officials would like to view Grafton & Upton's operations.  Nierenberg subsequently explained that the EPA did not have the authority to bring town officials on to Grafton & Upton's property "for oversight."

On December 5, 2022, as he prepared for the next water and sewer commission meeting, Burt contacted Nierenberg with another list of questions about Grafton & Upton's operations, raising many of the same concerns.  He apologized "for the long list" but stated he was "obligated to continue to request this information," because "[the water and sewer commission], responsible for the Hopedale public water supply, and the community, remain concerned."  See G. L. c. 40N, §§ 1, 4, 8.  At this point, a DEP official sent an e-mail message to Nierenberg

stating, "Sorry this won't end. I would suggest not answering these questions directly. I think it's time to somehow end the back and forth."

Nierenberg did respond, however, reiterating to Burt that under the Federal law that governed the project, permits were not required, the EPA and the DEP would continue to oversee all work, and together they would verify that all work under the transportation and disposal plan met all State and Federal standards. She assured Burt that the "issues" with the bags were "a priority for the site team" and revealed that the EPA, the DEP, and de Maximis were investigating why forty percent of the bags were tearing during the transfer process (emphasis added). She pointed out that only a small portion of the tears had resulted in spills, that "poly sheeting" placed on the ground each morning was "working to limit new releases of soil . . . that require an emergency response," and that "more permanent measures were being considered."

On December 16, 2022, Burt asked Nierenberg to provide a "quick status" about the potential impact of the recent heavy rain on the NMI materials at the railyard. A de Maximis employee explained to Burt that the rain would be a nonissue for the materials.

On January 19, 2023, Burt sent another list of questions and concerns to Nierenberg, most of which had been asked and

answered previously. He requested answers before the next water and sewer commission meeting and advised her to possibly expect more questions from the town administrator, who "coordinates with the Select Board and other town boards, which we can address as a follow-up."

On February 16, 2023, Burt notified an EPA official that he continued to receive comments from residents about the town's "railyard situation" in light of a recent train derailment in Ohio that had caused an environmental disaster. He stated that the town had expected "ground barriers, emergency procedures and oversight" would follow after the Zone II issue was revealed to the EPA, but "[t]hat didn't happen." He concluded, "At this point, I don't think the community will accept anything less than stopping the soils . . . from being brought into the Zone II."

On March 13, 2023, Burt contacted Nierenberg again as well as her contact at the Federal Surface Transportation Board complaining again about the lack of local oversight and requesting direct trucking of the contaminated soil from Concord to Michigan or the use of a "more appropriate (non-Zone II)" transloading facility. A week later, having been notified about more shipments of contaminated soil headed to Hopedale, Burt made the same "direct trucking" request to Nierenberg.

Despite Grafton & Upton's provision of "exceptional" transloading services, in April 2023, US Ecology terminated its contract with Grafton & Upton without explanation, and Grafton & Upton was removed from the transportation and disposal plan.

Discussion. 1. Standard of review. "We review a motion to dismiss de novo, accepting all well-pleaded facts in the complaint as true, drawing all reasonable inferences in the plaintiff's favor, and determining whether the allegations plausibly suggest an entitlement to relief." Cannata v. Mashpee, 496 Mass. 188, 191 (2025). Conclusory assertions cast as well-pleaded facts, however, are not regarded as true. See Edwards v. Commonwealth, 477 Mass. 254, 260 (2017), S.C., 488 Mass. 555 (2021). To withstand a motion to dismiss, "[t]he factual allegations must 'raise a right to relief above the speculative level . . . .'" Cannata, supra, quoting Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008).

2. Claims against Watson. We start by testing the legal adequacy of the claims against Watson, the manager of the town's water and sewer department. The theory of Grafton & Upton's case against Watson is that commencing in 2022, Watson and Burt "worked in concert" and conspired together to pressure and harass the EPA, the DEP, and de Maximis with the ultimate goals of securing (1) the termination of Grafton & Upton's contract with US Ecology and (2) Grafton & Upton's removal from the

transportation and disposal plan.  The first amended complaint paints Watson as a "behind the scenes" member of the conspiracy, providing encouragement and support to Burt.  Beyond conclusory accusations made "[u]pon information and belief," however, we are hard pressed to find any allegations at all about what Watson did or said to support or advance any such conspiracy.[9] It may be inferred (although not expressly alleged) that Watson was present at the August 22, 2022 meeting with Smith of the EPA, and he was copied on several of Burt's e-mail communications that followed.  But there is no allegation that Watson contacted any government officials, US Ecology, or de Maximis on his own or took any other action designed to interfere with Grafton & Upton's contractual and business relations or its constitutional rights.[10]  Removing from consideration, as we must, the labels and legal conclusions, the sparse allegations against Watson, individually, do not plausibly suggest an entitlement to relief on any legal basis. See Cannata, 496 Mass. at 191; Edwards, 477 Mass. at 260.  See also Anzalone v. Administrative Office of the Trial Court, 457

---

[9] The first amended complaint contains repeating allegations made "[u]pon information and belief" that Burt conferred and consulted with Watson before he sent each of the e-mail messages mentioned in the complaint and detailed in this opinion.

[10] Indeed, at the oral argument before this court, Grafton & Upton candidly admitted that it does "not have specific allegations with respect to [what Watson] did."

Mass. 647, 660-661 (2010) (plaintiff cannot withstand motion to dismiss by "talismanic invocation" of labels like "unconscionable" and "wrongful interference"); Schaer v. Brandeis Univ., 432 Mass. 474, 478 (2000) (plaintiff may not "rest on subjective characterizations or conclusory descriptions of a general scenario which could be dominated by unpleaded facts" [quotations and citations omitted]).  For this reason, if no other (see the common-law immunity analysis, infra), Watson was entitled to dismissal of the claims against him.[11]

3.  Claims against Burt.  a.  Common-law immunity.  Under the Massachusetts Tort Claims Act (MTCA), "public employees who commit negligent or wrongful acts or omissions 'while acting within the scope of [their] office or employment' are immune from liability," Berry v. Commerce Ins. Co., 488 Mass. 633, 636 (2021), quoting G. L. c. 258, § 2, regardless of the capacity in which they are sued, Doyle v. Quincy, 104 Mass. App. Ct. 761, 765 n.7 (2024).  Public employees sued in their individual capacity for intentional torts, like the defendants here, however, are not shielded by the MTCA, but they are protected by the doctrine of common-law immunity.  See Bresler v. Muster, 496

---

[11] Given our conclusion as to the claims against Watson and the waiver of claims against the Doe defendants, we need not separately address the conspiracy claim against Burt as a person cannot conspire with himself.  See Wodinsky v. Kettenbach, 86 Mass. App. Ct. 825, 837 (2015) (element of civil conspiracy is two or more defendants acting in concert).

Mass. 111, 122 (2025), citing Nelson v. Salem State College, 446 Mass. 525, 537 (2006). See also South Boston Betterment Trust Corp., 438 Mass. at 69 (claim against mayor, individually, for intentional tort covered by common-law immunity doctrine).

"Under the doctrine of common-law immunity, a public official exercising judgment and discretion is not liable for negligence or other errors during official decision-making, provided the official acted in good faith, without malice, and free of corruption." Bresler, 496 Mass. at 122. The "bad faith" that would trigger the loss of immunity is "more than bad judgment or negligence, but rather suggest[s] a dishonest purpose or some moral obliquity, a conscious doing of wrong, or a breach of a known duty through some motive of interest or ill will" (quotations and citation omitted), id., while the "'[m]alice' [that would trigger the loss of immunity] constitutes a wrongful act, done intentionally, without just cause or excuse" (quotations and citations omitted). Id. See Spiegel v. Beacon Participations, Inc., 297 Mass. 398, 416 (1937) (bad faith "partakes of the nature of fraud"). Importantly here, as we noted earlier, "[t]here is every presumption in favor of the honesty and sufficiency of the motives actuating public officers in actions ostensibly taken

for the general welfare" (citation omitted).[12] South Boston Betterment Trust Corp., 438 Mass. at 69. "To overcome this presumption, the plaintiff bears the burden of showing that the officials acted in bad faith or with malice." Bresler, supra. From a pleading perspective, "isolated allegation[s] . . . [that are] vague, unsupported, and conclusory" are inadequate to meet the plaintiff's burden. Id. at 121 n.8. Mere poor judgment or negligence will not suffice to establish a lack of good faith. Id. at 123. Applying these principles, we conclude that the allegations in the amended complaint are insufficient to overcome the presumption that Burt was acting in good faith and without the requisite malice.

Grafton & Upton's transloading facility is located in Hopedale's Zone II protected area -- a fact that was apparently brought to the EPA's attention by Burt. The contaminants headed Hopedale's way in 2022 under the transportation and disposal plan and Grafton & Upton's contract were from a Superfund site and included depleted uranium -- reasonably raising concerns for a public servant charged with oversight of the public water supply. And more than trains passing through Hopedale en route to other destinations was involved: over 100,000 tons of

_____

[12] Moreover, there is no merit to Grafton & Upton's claim that the presumption does not apply at the pleading stage. See Bresler, 496 Mass. at 112-113.

contaminated soil in bags that had experienced frequent tearing were expected to be shipped by tractor trailers to the railyard in Hopedale's Zone II protected area and transferred from the trucks via gondolas to the railcars.

So far as the record reveals, as the chair of the water and sewer commission -- the public body charged with ensuring the environmental condition of the town's public water supply, see G. L. c. 40N, § 1 -- Burt had every right and the responsibility as part of his official duties to question the possible impact of the shipments, the safety precautions in place, and the oversight of the transloading. Indeed, it would have been a dereliction of duty not to have asked questions about activities of this magnitude in the town's Zone II protected area and not to have monitored and questioned the operations closely, as Burt did.

Burt's numerous and frequent communications to the EPA, the DEP, and de Maximis officials do not show bad faith or actual malice but reflect the record of a local official trying to do a thorough job on behalf of his town and to minimize the chance of any possible disaster. From the start, Burt expressed concern about possible accidents in the Zone II protected area. See note 5, supra. Despite the representations by the DEP that the contaminated soils would arrive in Hopedale in "fully sealed" containers, a spill occurred during the very first shipment, and

the bags used to hold the soils thereafter were often failing during the process. In this context, Burt acted well within his authority in repeatedly expressing concern about, among other things, the risk posed by the spills, questioning the future containment efforts, and requesting ongoing soil testing and safety precautions. No town wants depleted uranium-contaminated soil anywhere near its water supply. No inference of bad faith or actual malice arises from Burt's repeated requests that EPA officials amend the transportation and disposal plan to ship the contaminated soil directly to Michigan or to use another transloading site that was not located in a Zone II protected area. Compare Najas Realty, LLC v. Seekonk Water Dist., 821 F.3d 134, 146 (1st Cir. 2016) (Najas Realty II) (concluding "complaint failed to state a plausible claim that bad faith or malice, as opposed to a concern for the Town's residents' general welfare, motivated [water district superintendent's] behavior").

As evidence of Burt's bad faith, Grafton & Upton relies on his failure to post public notice of the August 22, 2022 meeting called by Smith of the EPA -- as well as his failure to post public notice of his August 23, 2022, and December 5, 2022 e-mail messages to Smith and Nierenberg -- allegedly in violation of the Massachusetts open meeting law. See G. L. c. 30A, §§ 18, 20. Grafton & Upton has failed to bring to our

attention, and we are unaware of any, cases requiring a public official to post public notice in these circumstances. In any event, the fact that this meeting and these communications took place outside of a regular public meeting of the town's water and sewer commission does not suggest bad faith or actual malice on Burt's part. See Bresler, 496 Mass. at 122 (defining "[b]ad faith" and "[m]alice for purposes of common-law immunity).

Nor do the few comments Grafton & Upton has pointed to as demonstrating Burt's alleged animosity and ill will towards it evince the type of bad faith or malice sufficient to cause the loss of immunity. Compare Najas Realty II, 821 F.3d at 137-139, 145-146 (no bad faith or malice shown by "conclusory" allegations that water district superintendent raised "bogus" health concerns in opposition to project and stated he wanted developer "to go away" and be forced to "jump every hurdle"). Businesses subjected to local regulation often perceive local officials to be acting with ill will or personal animosity against them. See, e.g., id. at 138 n.4 (plaintiff alleged water district imposed costly and unnecessary requirement at "eleventh hour" on its second development project "to harass and hinder" plaintiff). The alleged demonstration of ill will and personal animosity in the past regarding "other matters," without further supporting allegations, is insufficient to meet the bad faith and malice standards required to overcome "the

presumption that public officials act honestly and in the public interest."[13]  Bresler, 496 Mass. at 122.  Cf. Massachusetts Auto. Rating & Acc. Prevention Bur. v. Commissioner of Ins., 401 Mass. 282, 298 (1987) (adverse rulings of commissioner insufficient to show bias); Clark v. Clark, 47 Mass. App. Ct. 737, 739 ("mere fact that party suffers adverse rulings during litigation does not establish lack of judicial impartiality").

Similarly, the February 2021 warning from a former town administrator to Burt to "stop conflating" his personal opinions with his official responsibilities was not related to the e-mail messages at issue as the "warning" preceded by some eighteen months the first e-mail message at issue here.  Given the presumption of honesty enjoyed by public employees, the allegations about the warning, without more, do not plausibly suggest that Burt acted with malice or in bad faith, as those terms are defined by our case law, toward Grafton & Upton in 2022 and 2023.  See Bresler, 496 Mass. at 122.  See also South Boston Betterment Trust Corp., 438 Mass. at 69 (courts must indulge "every presumption in favor of the honesty and

---

[13] Even if Burt had made these comments contemporaneously with his statements to the EPA and the DEP, on their face the comments concerned actions by Grafton & Upton that could reasonably cause concern to local officials, and thus, they were an insufficient basis to defeat his common-law immunity.

sufficiency of the motives actuating public officers in actions ostensibly taken for the general welfare" [citation omitted]).

Additional conclusory allegations against Burt in the first amended complaint made "[u]pon information and belief" -- that he "interfere[d] with" Grafton & Upton's "contractual relations" and its "business relations" "in retaliation" for its acquisition of a separate property in Hopedale and its successful opposition to the town's attempt to take that property by eminent domain -- are unavailing. See Najas Realty, LLC v. Seekonk Water Dist., 68 F. Supp. 3d 246, 250, 259-260 (D. Mass. 2014), aff'd, Najas Realty II, 821 F.3d 134 (finding similar allegations -- that water district superintendent retaliated against developer and interfered with his business and contractual interests to punish him for having outbid water district for certain property in town -- inadequate to overcome common-law immunity). See also Bresler, 496 Mass. at 101 n.8.

As further evidence of Burt's bad faith and malice, Grafton & Upton relies on a communication from Scott Binder, a US Ecology vice-president, sent after Grafton & Upton's termination stating, "I don't see any way that de [M]aximis and EPA Region II are coming back to [Grafton & Upton] for this project . . . they don't need the bad publicity and the threats and all that stuff." However, there are no allegations or evidence in the record as to the source of the "threats," what other "stuff" was

allegedly said or done, the context of the communications, who was present, or when the "threats" were made. Although Grafton & Upton is entitled to all reasonable inferences in its favor, no plausible inference of bad faith or malice by Burt can be drawn from the vague and generalized statement.[14] See Bresler, 496 Mass. at 101 n.8 (absent specifics, vague and unsupported allegations "fail[ed] to raise more than a speculative right to relief"); Caverno v. Fellows, 286 Mass. 440, 442-443 (1934), S.C., 300 Mass. 331 (1938) (affirming dismissal of teacher's tort claims where general allegations that defendant public employees made "false and fraudulent" charges against plaintiff to members of school committee were not "set forth according to their tenor or . . . their substance and effect" and where general allegations that "the defendants did hamper, obstruct and impede the plaintiff in her work" were "of the most general nature and [did] not particularize in any degree").

Grafton & Upton also rely on an internal US Ecology communication dated March 3, 2023, that was attached to Grafton

---

[14] We note that the tone of Burt's e-mail messages to the EPA, the DEP, and de Maximis was unwaveringly polite and professional, and that the contaminated soil from the Superfund site was transported by truck and rail through a number of towns in addition to Hopedale, one or more of which could have been opposed to the presence of contaminated soil passing through their communities and thus could have been the source of the alleged threats.

& Upton's opposition to the defendants' motion to dismiss.[15] That message suffers from the same infirmities as the statement by Binder that we set forth above:  the actual source of the pressure exerted on the EPA and de Maximis to move the transloading activities is not named, and no further details are provided.  Again, notwithstanding the favorable standard, the inference that Burt (and Watson) were "the Town" referenced in the e-mail message is speculative.  Many residents of Hopedale would have been very interested in ensuring that these materials were not transported there.  More than a speculative right to relief is required to state a claim for relief seeking to hold a public official individually liable for money damages.  See Bresler, 496 Mass. at 121 n.8.

At bottom, the allegations of the complaint do not plausibly suggest that Burt acted outside the scope of his authority or with personal animus against Grafton & Upton.  As Grafton & Upton concedes, Burt held himself out as an official of the town and signed most of his e-mail messages with his title.  Part of his duties was to communicate with other

---

[15] In the March 3, 2023 e-mail message, Joe Weismann, a US Ecology director, reported to Wayne Hinton, a manager, that "Bruce Thompson [of de Maximis] called me earlier this week and shared that the Town of Hopedale is providing more pressure on EPA and de Maximis about the [Grafton & Upton] Railroad. Pressure is being applied to the point where Bruce is strongly considering having us move [the] transload[ing] to another location."

government officials. It was neither surprising nor beyond the scope of his duties for Burt, the chair of the town water and sewer commission, to direct most of his concerns about activities in the Zone II protected area to the EPA and the DEP -- the project overseers charged with ensuring that all Federal and State standards were being met. Upton & Grafton has provided no authority by way of the local bylaw or other regulation of the chair of the water and sewer commission's role to suggest otherwise. The content of Burt's e-mail messages demonstrates that he sought information from these government entities for upcoming water and sewer commission meetings. His failure to include Grafton & Upton in his communications does not bespeak bad faith. And where Burt consistently identified himself as a water and sewer commissioner, the fact that Burt may have used his personal e-mail account to communicate does not show that he was acting outside the scope of his official duties.

Grafton & Upton's reliance on Burt's January 19, 2023 e-mail message as evidence that Burt was acting outside his office is similarly misplaced.[16] The fact that none of the town

---

[16] In questioning why "the transport is being done without a special permit," Burt wrote, by way of background in that e-mail message, "As a Zone II Water protected district[], the Town (via the Board of Health, Conservation Committee, Zoning Board and Water & Sewer Commission) has an oversight responsibility to ensure water quality. Operating without a special permit, the

boards and commissions listed in the e-mail message had expressly "voted to authorize" him to ask these questions and make these statements, even if true, does not change that the boards and commissions in fact have oversight responsibility to ensure water quality, which is all that Burt asserted, and is not evidence that he acted beyond the scope of his authority as chair of the town body charged with overseeing the public water supply potentially impacted by activities in the Zone II protected area.[17]  In short, the allegations do not plausibly suggest that Burt acted outside the scope of his authority.

To be sure, Burt repeatedly asked the same questions and made the same complaints to the EPA and others about Grafton & Upton's transloading activities.  He also continued to seek

---

ability to perform this oversight is being denied."  To the extent that Grafton & Upton alleges that this statement was "false" and the complaint alleged, in conclusory fashion, that Burt made a number of false statements and misrepresentations to the EPA, nothing Burt said in any of the e-mail messages of record was untrue.  Cf. Brighams Cafe, Inc. v. Price Bros. Co., 334 Mass. 708, 708 (1956) (affirming judgment of dismissal where, in lieu of substantive facts, complaint alleged, "in general terms and by way of conclusions, that the defendant took action or made statements which the [complaint characterized] as 'false and fraudulent'").

[17] Burt expressly acknowledged that the town understood that the materials were not classified as "hazardous" and were thus allowed to be transported through the Zone II protected area.  Burt suggested, however, that if the materials were so bad as to require disposal in a special landfill, the materials should be given "special handling" in the Zone II protected area.

local oversight of the transloading operations to which the town was not entitled. He may even have overstated the risk posed by the activities. Burt's motives and concerns for the town's water supply and the welfare of town residents, however, are presumed to have been honest and sufficient. It was Grafton & Upton's burden to allege facts showing he was acting in bad faith, with malice, or with corruption. This it has not done. Based on his immunity, which Grafton & Upton failed to defeat, the common-law claims against Burt were properly dismissed.

b. MCRA claim. Grafton & Upton alleges that Burt "interfered with [its] constitutional rights to use and improve its property in Hopedale" and that Burt accomplished the interference by "threats and coercion," terms of art for purposes of a MCRA claim. See Gibson v. Department of Correction, 106 Mass. App. Ct. 201, 210 (2025). Specifically, Grafton & Upton alleges that Burt threatened or exerted pressure on de Maximis and the EPA, "caus[ing] [them] to direct US Ecology to terminate [Grafton & Upton]'s transloading contract under the EPA-approved [transportation and disposal plan]." We conclude that no plausible inference can be drawn from these conclusory allegations that Burt engaged in threats or coercion within the meaning of the MCRA. See Glovsky v. Roche Bros. Supermkts., Inc., 469 Mass. 752, 753, 762-763 (2014) (affirming dismissal of MCRA claim where allegations were insufficient to

show violation of constitutional right was "by threats, intimidation or coercion").  Burt's communications contained no express statement or so much as a hint suggesting any adverse actions he would take if Grafton & Upton continued with its transloading activities.  Accordingly, this claim was properly dismissed as well.  Cf.  Freeman v. Planning Bd. of West Boylston, 419 Mass. 548, 566, cert. denied, 516 U.S. 931 (1995) (even where board erroneously sought concession from developer to improve intersection, claim under MCRA rejected where function of intersection was legitimately related to purpose of subdivision control law).

Conclusion.  The judgment dismissing the first amended complaint is affirmed.

So ordered.